[File No. 5987.]

M. A. HILDRETH, a Stockholder of the Western Realty Company, a Corporation, Suing in Behalf of Himself and All Stockholders Who May Come in and Be Made Parties to This Action, Respondent and Appellant, v. THE WESTERN REALTY COMPANY, a Corporation, John Tracy, Treasurer of Said Company, H. F. Emery, Secretary, Jos. M. Kelly, President, J. D. Runsvold, R. Daeley, R. C. Haagenson, A. G. Foogman, E. N. Hegge, H. L. Loomis, L. K. Rosten, and D. O'Malley, Appellants and Respondents.

(242 N. W. 679.)

234

Opinion filed February 13, 1932.   Rehearing denied May 31, 1932.

*Allen W. Wood* and *Shure & Murphy,* for appellants and respondents.

*M. A. Hildreth,* pro se and *Holt, Frame & Nilles,* for respondent and appellant.

Lowe, Dist. J. Several years prior to the year 1913 a corporation known as the North Dakota Improvement Company was organized under the laws of the State of North Dakota. In the course of its business it entered into contracts with a large number of persons, which were evidenced by investment certificates. In 1913 the company was confronted with financial difficulties and was placed in the hands of a receiver in a proceeding brought in the district court of Cass county. During the pendency of that proceeding a reorganization plan was perfected whereby a new corporation known as the Western Realty Company of Fargo was organized. The authorized capital stock of the new company was to be $450,000, divided into 45,000 shares of the par value of $10 each. $400,000 of this was preferred stock and $50,000 common stock. The plan called for the is-

suance of preferred stock to the holders of investment certificates at 75 per cent of their face value and the issuance of common stock to the stockholders in the improvement company at 75 per cent par value of such stock. In carrying out this reorganization arrangement, preferred stock aggregating $383,382.50 par value was issued and common stock aggregating $45,000 was issued. No other stock was ever issued. The certificates had printed upon them the essence of the contractual arrangement under which they were issued. The preferred stock called for a 6 per cent annual cumulative dividend payable out of the net profits, the unpaid dividend in any year to become a charge against the future net profits before any dividend should be paid upon the common stock. In the event the net profits should exceed the cumulative dividends on the preferred stock a dividend might be declared upon the common stock and, if the earnings warranted more than a 6 per cent non-cumulative dividend on the common stock, the preferred stock should share equally with the common in any additional dividends. The preferred stock was subject to redemption according to the priority of its issuance by the common stockholders paying the principal at par and cumulative dividends and was further subject to recall and reissuance upon a pro rata distribution to the preferred stockholders of proceeds realized from sales of any of the corporate properties, and it was subject to the consequent reduction of the preferred capitalization. In the event of dissolution or termination of the corporation, the holders of the preferred stock were entitled to par value and cumulative "interest" thereon before anything should be paid on the common stock, and the preferred stock was entitled to vote on the same basis as common stock. Upon the certificates of common stock there was likewise printed the essence of this contract or enough of it to show the priority to be enjoyed by the preferred stock and the rights of the common stockholders to redeem or retire the preferred stock.

While the charter of the Western Realty Company was broad enough to authorize the transaction of business far beyond the scope necessary to handle the property thus acquired by it and to liquidate the affairs of the improvement company, it was, as a matter of fact, confined to the latter activities. In the course of years a large amount of indebtedness secured by liens upon the property acquired was paid and some

of the properties were sold, the proceeds being invested in what may be termed quick assets. From time to time some dividends were paid on the preferred stock. Up to the time of this litigation such dividends aggregated 14¾ per cent. In February, 1930, the board of directors passed a resolution reciting that proceeds of the sales of properties in excess of $153,270 were in the hands of the corporation, and they resolved to authorize and direct a pro rata distribution of this amount to the preferred stockholders, and that the preferred capital stock be reduced in accordance with law to the extent of the sum so distributed. They called a special meeting of the stockholders, to be held on the 21st day of May, 1930, to consider and act upon the proposal to reduce the preferred stock.

Under the plan of preferred stock reduction, which was authorized by the stockholders at this meeting, all the preferred stock was to be recalled, surrendered and cancelled, and the holders thereof were to be paid such pro rata amount of the par value thereof as the amount of the proposed reduction of the paid up stock should bear to the whole amount of paid up preferred stock, and new certificates were to be issued for the balance. That is, if the amount to be distributed in cash should represent 40 per cent of the par value of the outstanding preferred stock, the holder of 100 shares aggregating $1,000 par value would receive $400 in money and a new certificate for $600, and upon each certificate of reissued stock there would be printed a statement to the effect that it was issued in lieu of the prior certificate, identifying it, and that the holder of the new certificate would be entitled to his proportion of any cumulative dividends which had been accumulated and unpaid from the date of the original issuance down to the date of the new certificate. The amount to be thus paid out to the preferred stockholders was $153,270. The unissued preferred stock was cancelled, making the total amount of the reduction of preferred capitalization $170,095. Appropriate resolutions amending the articles of incorporation and by-laws to carry out such intended reduction of the preferred capitalization were passed by the stockholders and a certificate to like effect was duly executed by the officers and directors.

The charter provides that upon the sale of any portion of the assets or property of the corporation the board of directors may at their election make a pro rata distribution of the proceeds therefrom upon the

preferred stock and in accordance with law reduce the preferred capitalization to the extent of the sum distributed, and "that the common stock shall be subject to such preferential right of partial distribution upon the preferred stock, but shall have the right of retirement as hereinafter provided." It provides for preference to the preferred stock in the event of the bankruptcy, dissolution or termination of the corporation, reaching to the assets and extending to the payment of the preferred capital with all cumulative dividends thereon. It is then stipulated that the preferred and common stock shall share equally and pro rata in any surplus remaining after distribution to the preferred stock as above indicated and the payment at the par value of the common stock. The following proviso is then added:

". . . provided, however, that at any time prior to the dissolution, bankruptcy or termination of said corporation, and after all cumulative dividends on the preferred stock for all prior years have been paid, the whole or any part of the preferred stock, according to the priority of its issuance, as shown by certificate number, may be retired by the common stockholders paying the principal thereof at par and all cumulative dividends thereon."

Section 3 of article III of the by-laws provides that upon the dissolution and termination of the corporation the preferred capital stock is entitled to receive preferential payment in full at par together with all cumulative dividends thereon for all prior years before any payment shall be made upon the common stock, and that if the assets shall be sufficient to pay the preferred stock with the cumulative dividends thereon and the par value of the common stock, any surplus remaining shall be paid equally per share to both the preferred and common stock.

Section 6 of the same article provides for the retirement of preferred stock "after all cumulative dividends on the preferred stock for all prior years have been paid." The preferred stock is thus subject to retirement according to the priority of its issuance "by the common stockholders paying the principal thereof at par, and all cumulative dividends thereon."

Section 10 provides that: "In the event of the sale of any portion of the assets or property of the corporation, the board of directors may, at their election, make a pro rata distribution of the proceeds there-

from upon the preferred stock, and in accordance with law reduce the preferred capitalization to the extent of the sum distributed. That the common stock shall be subject to such preferential right of partial distribution upon the preferred stock, but shall have the right of retirement as provided by section six of this article." It is further provided that in the event of dissolution, bankruptcy or termination of the corporation the preferred stockholders shall be entitled to preferences: first "To the payment in full of the principal of the preferred capital stock at par with all cumulative dividends thereon in preference and priority to any payment upon the common stock; and second: To the payment of the principal of the common stock at par, and any balance remaining shall be divided equally and pro rata per share among the holders of the preferred and common stock, subject only to the right of retirement of the preferred stock, as hereinabove set forth."

The plaintiff, one of the preferred stockholders, brought the instant action to enjoin the carrying out of the plan. The plaintiff's attack upon the proceedings questions the legality of many of the steps taken. He challenges the power of the stockholders to take any action prejudicial to the enjoyment of the proportionate ownership of the corporation by the preferred stockholders and the consequent control vested in them. He attacks the notice of meeting and questions the manner in which the notice was given and the validity of the proxies voted at the meeting.

It is apparent that the things done and threatened to be done by the defendants, to which the plaintiff objects, would result in a reduction of the preferred stock by the amount above recited without reducing the common stock at all. If this can be done, then the defendants could reduce the preferred stock below 4500 shares and the control of the corporation would be then in the hands of the common stockholders. If it is permissible to reduce the preferred stock at all without reducing the common stock pro rata, and thus alter the voting power of the preferred stockholders, it is permissible to reduce the stock to a point where the preferred stockholders (original creditors of the old North Dakota Improvement Company) would lose their present control of the management of the company. Whether this can be done without paying the dividends on the stock so cancelled, will be considered first.

At the outset it is well to consider the original plan out of which

the present corporation grew, construing the fundamental agreement between the common and preferred stockholders. From an inspection of the record of the North Dakota Improvement Company receivership proceedings, it is apparent that the proposition made to the present preferred stockholders was that they should receive preferred stock bearing six per cent per annum cumulative dividends and that this stock liability including the dividends should be fully discharged before anything should be paid the common stockholders. The stock was later issued pursuant to this proposition. This original plan clearly contemplated paying the creditors of the old North Dakota Improvement Company 75 per cent of the amount due them with interest at six per cent per annum before the common stockholders should receive anything. Bailey v. Hannibal & St. J. R. Co. 17 Wall. 96, 21 L. ed. 611. This is borne out by the charter, by-laws and the stock certificates themselves, and is not inconsistent with them. In one place on the stock certificates the word "interest" was used instead of "dividends." The statement on the reverse side of the preferred stock certificates provides that the said preferred stock is "subject to recall and reissuance upon any pro rata distribution on the preferred stock of the proceeds realized from sales of any of its properties, and consequent reduction of the preferred capitalization." Does this mean that the preferred capital stock can be reduced by the full amount available for distribution out of the assets with the corporation remaining liable for unpaid cumulative dividends on the stock cancelled? We are of the opinion that it does not. If this could be done, then the company could later reduce the preferred stock to nil or to a minority status without paying the accumulated dividends and it could continue in business without paying either the accumulated dividends or any interest on them for an indefinite period in the hope of making profits which in the long run would inure to the benefit of the common stockholders. We do not find anything in the contract arrangement under which this corporation was organized and the stock issued which contemplated the possibility of the common stockholders controlling the corporation and operating it, in the hope of making a profit for themselves, on money which, as to them, would be owing to preferred stockholders. In the original plan it is clear that the parties did not contemplate any such possibility. It was not in their minds and not in their contract. When

the contract speaks of a consequent reduction of preferred capitalization upon the recall and reissuance of stock following a pro rata distribution to the preferred stock of the proceeds realized from sales of its properties it contemplates, in our opinion, the full discharge of the corporate liability upon any stock cancelled in this manner, and this full liability is not met until the accumulated dividends are paid.

The general rule is that stock in different classes can not be reduced so as to change the relative voting power of the different classes of stock and our statute (§ 4557, 1925 Supplement to the Compiled Laws of 1913) does not give that right, as it provides for increase or decrease of capital only in general terms. See Currier v. Lebanon Slate Co. 56 N. H. 262, 13 Mor. Min. Rep. 559; Page v. American & British Mfg. Co. 129 App. Div. 346, 113 N. Y. Supp. 734; Stokes v. Continental Trust Co. 186 N. Y. 285, 78 N. E. 1090, 12 L.R.A.(N.S.) 969, 9 Ann. Cas. 738. One of the good reasons for this is that through an increase or decrease of capitalization it is not contemplated that one class of stockholders shall lose rights without receiving corresponding benefits. This statute is a mere authority to make the capitalization conform to capital assets; not to change proportionate ownership.

In the instant case, however, it was apparently intended to change the relative voting power as between the preferred and common stock, because the parties contracted that it could be done—that if the assets were sufficient the preferred stock could be wiped out eventually by the pro rata reduction, at which time the preferred stock would represent no interest remaining in the corporation. To carry this out it would be necessary to pay all accumulated dividends on the stock so cancelled. The force of this statement is augmented when we consider that the original plan was to organize a "winding up" corporation to handle the affairs of the defunct North Dakota Improvement Company so as to pay off the creditors (the present preferred stockholders) and allow the common stockholders to take what was left. In view of this contract the preferred stockholders could not complain of a reduction in voting power which would follow as an incident to the full discharge of both capital and dividend liability upon as many shares as the amount distributed on this basis ratably would retire. Thus, if the amount to be distributed would discharge the capital liability as to 20 per cent of the preferred stock and the accumulative dividends on such 20 per cent,

the subsequent disparity in voting power is necessarily such as was contemplated by the provisions for the distribution of capital assets, and any greater disparity would involve the sacrifice of vested voting rights and would be both beyond the pale of the contract and the authority contained in the statute to reduce capitalization. The only provision expressive of the contract binding upon the stockholders that would lend any force to a different interpretation is that provision (see Section 10 of the by-laws) which speaks of making a pro rata distribution of proceeds of the sale of assets and in accordance with law reducing "the preferred capitalization to the extent of the sum distributed." When this is read in connection with all the other provisions outlining the rights of the preferred and common stockholders it clearly contemplates in our opinion, the reduction of the full preferred capital liability, including cumulative dividends or interest and not the reduction of the preferred capital on the basis of par value to the full extent of the sum distributed, leaving the corporation liable for substantial cumulative dividends on the stock cancelled. If upon liquidation the claim for cumulative dividends extends to the capital assets and is preferred to the claims of the common stockholders, no reason is apparent why upon a partial distribution of capital assets the same rule should not apply. This interpretation, too, is more consistent with the general purpose to use the Western Realty Company as a winding up corporation and with the provisions in the charter, by-laws and stock certificates looking toward that end, which we shall now briefly consider.

Each stock certificate provided that "in the event of dissolution, bankruptcy or termination of this corporation, the par value of all the preferred stock, and all cumulative interest thereon, shall be paid in full before the common stock, or any part thereof, or any dividend thereon, is paid." In the same place it was also provided that said preferred stock is "subject to recall and reissuance upon any pro rata distribution on the preferred stock of the proceeds realized from sales of its properties." In one of these provisions no reference is made to "interest" or "dividends," but in the other the preference is expressed. It requires no argument to fortify the proposition that when the preferred stock is ratably retired from a sale of the assets, it is to that extent a winding up of the business of the corporation; it is an act pointing to the eventual dissolution or termination of the corporation

and is a partial liquidation or dissolution. In this event under the contract and the law the preferred stockholders would be entitled to payment of accumulated dividends at the time of the payment of the stock out of the sales of assets. Page v. Whittenton Mfg. Co. 211 Mass. 424, 97 N. E. 1006; Johnson v. Johnson & Briggs, 138 Va. 487, 122 S. E. 100.

Counsel for the defendants claim that dividends could not be paid to the preferred stockholders out of the proceeds of the sale of assets. They emphasize the provision that makes them payable only out of net earnings. This contention is, of course, sound as applied to a going corporation using its whole capital, but it does not apply where a corporation is being liquidated either wholly or piecemeal in accordance with a contract arrangement to the contrary and where the "dividends" are only looked to to determine the relative rights of the stockholders.

It is undisputed that there are no creditors and no obligations other than those due to the preferred stockholders, and distribution in discharge of such obligation is no more objectionable than distribution in payment of the par value of the stock would be. The common stockholders cannot object because under their contract the corporation was obligated to pay both the preferred stock and the accumulated dividends before the common stockholders would get anything, and if the common stockholders exercised their option to retire the preferred stock they would have to do the same thing.

It is apparent from the foregoing that the board of directors themselves would have the right to retire the stock, as was attempted in this case, by paying the par value plus the accumulated dividends on the stock so retired, as such action would then come squarely within their powers under the contract.

The judgment entered in the trial court awards the plaintiff recovery of attorney fees in the sum of $1,500 and the judgment is made a specific lien against the assets of the Western Realty Corporation. The defendants on this appeal contend that this portion of the judgment is erroneous for the reason that the record shows the case is not one wherein a minority stockholder is entitled to be reimbursed for expenses incurred in litigation, including attorney fees, out of property saved for the corporation. The plaintiff has likewise appealed from this portion

of the judgment contending that the court erred in not awarding attorney fees in a larger amount or up to $5,000.

The record shows that after the trial on the merits had been concluded and the trial court had announced its decision the case was reopened on motion of the plaintiff to enable additional testimony to be received on the question of attorney fees. Evidence was taken showing the amount of time spent and the character of the service rendered and expert testimony was adduced to the effect that, upon the assumption that the plaintiff had saved $150,000 of the assets of the corporation from being dissipated or illegally disbursed a fee of $5,000 would be reasonable. In the view we take of the case it is not necessary to examine the evidence critically in this regard. It shows that the plaintiff devoted a great deal of time to the preparation of the case and to the handling of the litigation. It shows there was a substantial basis for questioning the legality of the proceedings taken looking toward the reduction of the capitalization and that the questions presented were not free from difficulty. It may therefore be assumed that the quantity and quality of work actually done by the plaintiff was such as would ordinarily warrant the payment of a larger fee than that represented in the judgment below if performed for a client who had employed him for the purpose. But the plaintiff here is not able to invoke any contract between him and those who would be compelled to pay any fee awarded in the judgment and he does not do so. He relies instead upon the rule which is frequently invoked in suits by minority stockholders which have resulted in benefit to the corporation either through the discovery of assets or through the prevention of loss of assets, the minority stockholder so responsible for the benefit being equitably entitled to reimbursement for the expenses of such litigation, including attorney fees. Beyer v. North American Coal & Min. Co. 43 N. D. 401, 175 N. W. 216; Kilby v. Movius Land & Loan Co. 55 N. D. 830, 215 N. W. 284. The plaintiff's right to fees depends upon this rule.

It will be noted in this case that the preferred stock is subject to recall and reissuance upon a pro rata distribution on it of the proceeds realized from the sale of any of the corporate properties. The directors, therefore, would have a right, under the contract, assuming rights of creditors not to be involved, to disburse the $150,000 or more realized from the sale of properties to the preferred stockholders pro rata, just

as has been attempted in connection with the action looking toward reducing the capitalization. The disbursement alone is neither wrongful, nor ultra vires. Hackett v. Northern P. R. Co. 36 Misc. 583, 73 N. Y. Supp. 1087; Weidenfeld v. Northern P. R. Co. (C. C. A. 8th) 63 C. C. A. 537, 129 Fed. 305. It is not held and cannot be held on this record that the holders of the preferred stock are not entitled to distribution on the pro rata basis contemplated. In other words, each is entitled to the sum he would have received had the entire plan of distribution and reduction of capitalization been carried out. It is only the attempted reduction of the capitalization with the excessive reduction of voting power that is illegal. So far, therefore, as the substantial rights of any preferred stockholder to his equitable ownership pro rata in the assets to be distributed is concerned, nothing has been accomplished in this litigation. No property has been found and no property saved to either the corporation or to the rightful preferred owners of the fund derived from the sale of assets. There was no proposal to dissipate the corporate property by turning it over to those not entitled to receive it and the judgment in this action cannot properly award a permanent injunction that would prevent a distribution of the fund in question to the very stockholders to whom it was proposed to distribute it in the first instance—one that will give each.the exact amount he would have received. The effect of the litigation is merely to control the managerial acts of the directors and to define the powers of stockholders with reference to diminishing the capital stock so that there may be no discrimination against the preferred stock in reducing capitalization. The decision in this litigation merely emphasizes certain fundamental principles in the conducting of corporate affairs. It says that to redeem stock by discharging the liability of the corporation as evidenced thereby and to cancel it as diminished are wholly distinct operations. The first can be done as relates to the preferred stock under the charter and by-laws of this corporation to the extent that the assets will permit, but the latter may be done only under the general statute and in a way which affects equitably and justly the different classes of stock.

In the matter of allowance of attorney fees the nearest approach we find to an analogous situation is that presented in Hempstead v. Meadville Theological School, 286 Pa. 493, 49 A.L.R. 1145, 134 Atl. 103. In that case the minority trustees of a theological school had suc-

cceded in restraining the majority from transferring the assets of the school to another corporation to enable the latter to carry on the purposes of the organization. This minority attempted to recover attorney fees based upon the effect of their action which was to keep within the control of the corporation the assets which it had been proposed to transfer to a new corporation. The appeal involved only an allowance of fees and the court reasoned regarding the matter as follows: "But the attempted transfer of property to the Illinois corporation, (the new corporation) if it can be so called, to be used for the same purpose, would not be a dissipation of the property in any sense of the word. The transfer might have been to its very great benefit, certainly not to its disadvantage. The purpose of the old school and the trust created thereunder could have been carried on as effectively under that arrangement as under the one which was ordered by our prior decision. We so state to elucidate the question of the purpose of that and this litigation. Its effect was to control the managerial acts of the trustees. It was not to preserve property or a fund, and consequently under no stretch of our law could it be brought within the scope of the cases allowing counsel fees. The court below was clearly in error in ordering the school to pay. There was no doubt that these gentlemen earned the money, and, in all fairness to them, as a result of the litigation clarifying the legal standing and rights of the parties, they should be paid, but not from the school." We are of the opinion, for the reasons stated above, that that portion of the judgment allowing attorney fees is erroneous.

Additional questions are considered in the briefs of counsel, but since, under the view we take of the case, the judgment would not be affected by a determination of such questions one way or the other, it is unnecessary to decide them.

The judgment will be modified in accordance with the views expressed in the foregoing opinion and as so modified affirmed.

CHRISTIANSON, Ch. J., and NUESSLE and BIRDZELL, JJ., and HUTCHINSON, Dist. J., concur. BURKE and BURR, JJ., being disqualified, did not participate; Hon. JOHN C. LOWE, Judge of the Fifth Judicial District and Hon. WM. H. HUTCHINSON, Judge of the Third Judicial District, sitting in their stead.

(On Petition for Rehearing May 31, 1932.)

Lowe, Dist. J.    Counsel for the plaintiff have filed a petition for modification of the opinion by eliminating therefrom the holding that the board of directors have the power under the law, the charter, the by-laws and the facts disclosed in the instant case to distribute the fund derived from the sale of corporate assets to the preferred stockholders, thereby ratably redeeming and cancelling such stock as could be fully redeemed by such distribution.    They also petition for a rehearing or modification of the opinion with respect to the holding regarding the allowance of attorney fees.    Counsel for the defendants likewise petition, seeking to have the opinion clarified in some respects.    We shall as briefly as may be consider the petitions in the above order.

Nothing need be added to the opinion by way of showing that the contract between the holders of preferred stock and common stock and the corporation contemplated that the board of directors should have the power to sell assets and distribute the proceeds to preferred stockholders in redemption or retirement of their stock.    Such is clearly the contract in fact as is pointed out in the opinion.    But the plaintiff contends that any provision expressed in a preferred stock certificate for the redemption of such stock that does not fix a time for retirement or a price to be paid would not be a compliance with the statute (Comp. Laws 1913, § 4558) and that, consequently, the preferred stock in this corporation is not redeemable in the manner stated.    The certificates say that the stock is subject to recall and reissuance upon any pro rata distribution on the preferred stock of the proceeds realized upon sales of any of its properties, and consequent reduction of the preferred capitalization.    It is true that this does not fix a time for redemption with reference to the calendar, nor does it state in words the price to be paid.    But must it be inferred from this that the preferred stock is invalid as regards the preference?

Section 4558 of the Compiled Laws of 1913 reads:

"Every corporation shall have power to create two or more kinds of stock of such classes, with such designations, preferences and voting powers, or restriction or qualification thereof, as shall be stated and expressed in the articles of incorporation; and preferred stock may, if desired, be made subject to redemption at no less than par, at a fixed

time and price, to be expressed in the certificate thereof; and the hold-ers thereof shall be entitled to receive and the corporation shall be bound to pay thereon a fixed yearly dividend, to be expressed in the certificate, payable quarterly, half yearly or yearly before any dividend shall be set apart or paid on the common stock, and such dividends may be made cumulative."

It will be noted that the power to create two or more kinds of stock is expressly conferred, but whether or not they are created depends. altogether upon what is expressed in the articles of incorporation. It is mandatory that the classes *shall be stated and expressed* in the arti-cles of incorporation, but the following clause in the statute does not employ mandatory language. It is permissive. It says, that the pre-ferred stock may, if desired, be made subject to redemption at no less than par, at a fixed time and price, to be expressed in the certificate thereof. We fail to see, in this language any evidence of legislative intention to strike down any portion of the preferred stock contract for failure to incorporate in the certificate a fixed time or a fixed price or place of redemption. In view of the difficulty, frequently presented, of determining whether or not one is a preferred stockholder or a credi-tor, a provision of this sort in a statute dealing with preferred stock would tend to set at rest the contention which might otherwise be rea-sonably urged, in the event of the issuance of redeemable preferred stock, that such stockholder was in reality a creditor. See 6 Fletcher, Cyc. Corp. §§ 3630, 3631. It will be noticed that there are no express limitations upon the preferences permitted. They are such "as shall be stated and expressed in the articles of incorporation," not such as shall be so stated and also incorporated in the certificates. The clause in the statute that "preferred stock may, if desired, be made subject to redemption at no less than par, at a fixed time and price, to be expressed in the certificate thereof," is in substance a statement that though the stock evidence a definite obligation or option for the payment of a given amount of money at a given time and place, thus possessing the common characteristics of an ordinary debt, it shall nevertheless be preferred stock. (In the instant case the articles of incorporation express the preference and the power of the board of directors to make a pro rata distribution of proceeds of sales of assets or property.) In any event the statute does not purport to require that a definite time be fixed for

redemption rather than a time to be determined by a contingent event, such as the sale of assets, and so far as the matter of price is concerned the reasonable interpretation of the indorsement on the certificates in question is, in our opinion, to prescribe payment at the par value and the stipulated unpaid dividends.

The stock in question was redeemable stock, and the power to redeem it was, as pointed out in the original opinion, in the board of directors subject to be exercised upon their option. The effect of a redemption or retirement of preferred stock in accordance with the contract under which it was issued "necessarily involves a reduction of the capital stock of the corporation," (6 Fletcher, Cyc. Corp. § 3646), unless it is redeemed and converted into an obligation of some other form. Appropriately enough, the stock certificates in this case practically express this rule of law by stating that the stock is subject to recall and reissuance upon any pro rata distribution on the preferred stock of the proceeds realized from sales of any of its properties, "and *consequent* reduction of the preferred capitalization." (Italics supplied.) In other words, upon the redemption by the corporation of preferred stock from proceeds of the sale of assets the preferred stock is retired and the preferred capitalization reduced.

But in their petition counsel for the plaintiff assert: "It must ever be borne in mind in a consideration of this case that the old North Dakota Improvement Company turned over the assets to the Western Realty Company under an express promise written in the charter, the by-laws and the stock certificates that if retirement was made of the preferred stock, either by the common stockholders or otherwise, it must be done through the action of the stockholders, and (2) could only be brought about by their action. .This is manifested by the fact that under the terms of the contracts, if retirement of the preferred stock was had, the common stockholders were required to pay the full face of the certificates plus six per cent cumulative dividends."

Here counsel overlook that portion of the by-laws (article 3 of § 10), quoted in the original opinion, expressly conferring upon the board of directors the right to make a pro rata distribution of the proceeds of the sale of assets "and in accordance with law reduce the preferred capitalization to the extent of the sum distributed." This is further recognized, as previously shown, by the stipulation printed upon the

stock certificates. Counsel are likewise mistaken in assuming that the stipulation providing for the redemption and retirement of the preferred stock by the common stockholders is an indication that the directors were not to have the power. This right is wholly independent of the right of the corporation through its directors to redeem the stock, as a careful analysis of the by-laws and the contract printed on the certificate clearly shows.

Answering, generally, counsel's argument that it is only the stockholders who can reduce capitalization, it is only necessary to point out that the charter and the by-laws provide that the directors may redeem preferred stock through the distribution of capital assets and that they, the directors, may so reduce the preferred capitalization to the extent of the sum distributed. To deny this power which is thus a part of the stock contracts would be to permit the preferred stockholders, by exercising their voting power, to abrogate their contract.

Further answering the contention that the capital stock of a corporation can only be decreased by vote of the stockholders in pursuance of the procedure outlined in § 4557, Compiled Laws of 1913, as amended by chapter 46, Laws of 1921, it may be stated that the following section expressly authorizes the issuance of a kind of stock which may be made subject to redemption, and when stock is redeemed it is retired. It is no longer a part of the capital of the corporation and "where retirement is specifically authorized by the statute, statutory requirements as to the manner in which stock may be reduced do not apply." 6 Fletcher, Cyc. Corp. § 3644. Hence, an authorization of the directors to redeem and effect a consequent reduction of the capitalization is not a direction to submit the matter to the stockholders under other provisions of law. See Mannington v. Hocking Valley R. Co. (D. C.) 183 Fed. 133, for a discussion of the effect of charter and statutory provisions for redemption of stock, including the power of the board of directors to carry out contracts or options for retirement as a part of the corporate business devolving upon it. See also Baldwin v. Miller & Lux, 152 Cal. 454, 92 Pac. 1030; Schulte v. Boulevard Gardens Land Co. 164 Cal. 464, 129 Pac. 582, 44 L.R.A. (N.S.) 156, Ann. Cas. 1914B, 1013.

Further consideration of the question of the allowance of attorney fees in the light of the petition for rehearing has served to confirm our

original views rather than cast any doubt upon what was said upon that subject in the original opinion.

Counsel for the defendants in their petition set out wherein the opinion seems to them to be lacking in clarity. In the end, however, their deductions are fairly accurate and perhaps the opinion may best be "clarified" by correcting such inaccuracies as appear in the deductions of counsel. Such deductions we quote below:

"(1) That the attempted reduction of the preferred stock without the payment of accrued cumulative dividends is illegal and that the decree enjoining such reduction should be affirmed."

This is correct.

"(2) That a portion of the stock might be retired by the payment of the full amount thereof plus all accrued cumulative dividends."

Limited to preferred stock, pro-rating the amount to be so retired among the various holders, and discharging the cumulative dividends only on the amount to be thus retired, the deduction is correct.

"(3) That no reduction of the preferred stock may be had which would in any manner tend to alter the relative voting powers of the two different classes."

We do not know whence counsel derive this deduction. The opinion specifically points out that as a result of the retirement of preferred stock through redemption there will necessarily result some disparity or alteration of voting power. Of course, stock that is retired would no longer vote and it is only preferred stock that would be retired and it only to the extent it would be redeemed.

"(4) That the fund in question may be lawfully distributed to the preferred stockholders in payment or partial payment of accrued cumulative dividends and that this may be done by the directors."

We have had no occasion to consider whether the fund might be distributed in payment or partial payment of accrued cumulative dividends alone. The opinion, we think, clearly enough points out wherein the directors are authorized to redeem the stock by the payment of the amount due, par and dividends, i. e., so much pro rata as they can fully redeem with funds available from the sale of assets.

The petitions are denied.

CHRISTIANSON, Ch. J., and BIRDZELL and NUESSLE, JJ., and HUTCHINSON, Dist. J., concur.